UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

**TERESA L. GRAINGER**,                                   Case No. 3:12 CV 296

        Plaintiff,                                   Magistrate Judge James R. Knepp II

    v.                                                    MEMORANDUM  OPINION  AND
                                                          ORDER

**COMMISSIONER OF SOCIAL SECURITY**,

        Defendant.

## INTRODUCTION

Plaintiff Teresa Grainger filed a Complaint against the Commissioner of Social Security seeking judicial review of the Commissioner's decision denying disability insurance benefits (DIB) and supplemental security income (SSI). (Doc. 1). The district court has jurisdiction under 42 U.S.C. § 405(g) and § 1383(c)(3). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 14). For the reasons stated below, to the extent the ALJ ran afoul of the treating physician rule, the Court remands the Commissioner's decision for further proceedings consistent with this opinion.

## PROCEDURAL BACKGROUND

Plaintiff applied for DIB and SSI in January 2008, alleged a disability onset date of February 21, 2006, [1] claiming she was disabled due to carpal tunnel syndrome, anxiety, and depression. (Tr. 31, 135, 138, 176, 219); (Doc. 16, at 1). Although Plaintiff had previously filed

---

1. This date, also referred to by the ALJ, is inconsistent with Plaintiff's prior statements in her applications for disability. In the application for SSI, Plaintiff stated her "disability began on December 15, 2007" (Tr. 135), while in the application for DIB she claimed she "became unable to work because of [her] disabling condition on February 1, 2006" (Tr. 138).

applications for DIB and SSI in 2006 (*see* Tr. 173, 218-19), this decision is confined to the most recent applications.

Plaintiff's claims were denied, both initially and on reconsideration. (Tr. 61-74). She then requested a hearing before an administrative law judge (ALJ). (Tr. 75-76). After the hearing, at which Plaintiff, her attorney, and a vocational expert (VE) appeared, the ALJ denied Plaintiff's claims and found her not disabled. (*See* Tr. 7-56). The ALJ found Plaintiff's impairments were severe but she retained the residual functional capacity (RFC) to perform light work, follow detailed but uncomplicated instructions, and have brief and superficial contact with the general public. (Tr. 12, 15); *see* 20 C.F.R. §§ 404.1567(b), 416.967(b). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-6); 20 C.F.R. §§ 404.955, 404.981, 416.1455, 416.1481.

## FACTUAL BACKGROUND

Vocational History

Plaintiff, born on August 5, 1960, was 45 years old on her alleged onset date. (Tr. 18, 29). She graduated from high school and completed one year of college. (Tr. 18, 30). Her prior work history included positions as a child monitor, a machine operator, a price marker, a stocker, a warehouse worker, and a factory worker. (Tr. 18, 52, 177, 218). Plaintiff claimed she stopped working due to carpal tunnel syndrome, anxiety, and depression, and was unable to engage in substantial gainful activity after February 2006. (Tr. 31, 176-77, 219). Some of the records she provided, however, indicated she was very briefly employed in August 2006.[2] (Tr. 368-69).

Medical Records and Counseling History

Plaintiff's medical history included both physical and mental impairments. She alleged

---

2. Per an assessment prepared in September 2006, Plaintiff worked a "temporary job for three days in 8/06 but was unable to continue due to crying spells and major depression." (Tr. 369).

physical impairments related to carpal tunnel syndrome and cervical radiculopathy. (Doc. 16, at 3-4). Mentally, Plaintiff alleged major depression and anxiety. (Doc. 16, at 3, 5).

*Evidence of Physical Impairments*

Plaintiff underwent a carpal tunnel release surgery for both wrists around 1996. (Tr. 442, 445). In 2005, she was still complaining of carpal tunnel syndrome problems. (Tr. 252). On February 23, 2006, Dr. Sokoloski at St. Vincent Mercy Medical Center performed re-release on her left hand with "extremely" good results. (Tr. 438, 442-44). On April 4, 2006, he performed a similar surgery for her right wrist. (Tr. 438-41).

In May 2007, Plaintiff complained to her psychiatrist Dr. Shetty about pain from cervical radiculopathy, but there were no complaints of hand problems. (Tr. 259). Later medical records from St. Vincent Mercy Medical Center on April 9, 2008 indicated Plaintiff denied neck pain or back pain, had a full range of motion in her neck, and did not complain of pain in either upper extremity. (Tr. 384-85). Physical examination on that day confirmed normal findings in these areas. (Tr. 400).

Plaintiff saw Dr. Uche at Cordelia Martin Health Center for some of her symptoms in 2008 and 2009, including symptoms from carpal tunnel syndrome and cervical radiculopathy. (Tr. 33, 380, 446-57). In January 2009, Plaintiff saw Dr. Shah for symptoms of numbness and tingling in her hands and arms. (Tr. 378). She also complained of chronic neck and shoulder pain, but denied any other health problems. (Tr. 378). Physical examination for possible carpal tunnel syndrome revealed sensation to be intact to light touch and pinprick, strength within normal limits, and negative Tinel's sign. (Tr. 378). She had a fully functional range of motion in her upper extremities and cervical spine. (Tr. 378). Nerve conduction studies revealed a possible mild median nerve mononeuropathy at the right wrist and chronic bilateral C5-C6 radiculopathy.

3

(Tr. 378-79). A CT scan of her brain in February 2009 was normal. (Tr. 380). In March 2009, Plaintiff saw Dr. Ervin for further evaluation of the symptoms in her hands and neck. (Tr. 445). Testing of her neck range of motion caused discomfort, while x-rays and examination of both upper extremities failed to disclose any obvious deformities. (Tr. 445).

*Evidence of Mental Impairments*

Plaintiff's mental issues included major depressive disorder, dysthymic disorder, and cannabis abuse. (Tr. 312, 373). According to Plaintiff, these conditions dated back to traumatic childhood events. (Tr. 263, 269). Although Plaintiff reported a suicide attempt in 1985, she denied any psychiatric inpatient hospitalizations. (Tr. 263-64, 271).

Plaintiff attempted to treat her mental conditions over the years. In 2000, she attended Harbor treatment center for about six months. (Tr. 263). In 2006, Plaintiff's fiancé and sister died and following this she was referred to Unison Behavioral Healthcare. (Tr. 268, 271, 273). When Plaintiff first went there in September 2006, she reported she had "become unable to work due to her depressive symptoms including crying spells and no motivation." (Tr. 368). Plaintiff denied learning difficulties, barriers to learning, or special communication needs. (Tr. 368). She stated she had last worked on August 15, 2006 and was applying for Social Security benefits due to depression. (Tr. 368). Plaintiff also admitted using illegal drugs and reported she did not want to work, again noting she was currently unable to work due to depression. (Tr. 369-70).

In April 2007, Plaintiff reported improvement in her mental condition to her psychiatrist, Dr. Shetty. (Tr. 261). Specifically, she had noticed a decrease in crying spells and had learned positive coping skills. (Tr. 261). She also denied feelings of hopelessness or worthlessness and denied suicidal or homicidal ideation. (Tr. 261). Plaintiff was complying with the medications without adverse effects. (Tr. 261). Dr. Shetty continued to treat her with increased doses of

4

Effexor, with a positive effect. (Tr. 259-62). In June 2007, Plaintiff failed to show up for her appointments and her case at Unison was closed. (Tr. 257-58, 263).

In November 2007, Plaintiff sought to reestablish treatment at Unison. (Tr. 268). When she was assessed, Plaintiff again denied learning difficulties, barriers to learning, or special communication needs. (Tr. 270). She reported her hobbies included reading and crocheting. (Tr. 268-69). She was cooking family dinners and looking for a new church. (Tr. 269). Plaintiff also noted her strengths included helping people, listening, and treating people with respect. (Tr. 269). At that time, she reported she remained unemployed after her carpal tunnel surgery because of family, but she said she wanted to get back to work. (Tr. 270). Plaintiff denied using illegal drugs in the past twelve months and stated she had last used marijuana in November 2006. (Tr. 272, 276). The Adult Diagnostic Assessment suggested Plaintiff needed "employment related services to develop skills necessary for successful employment", or a referral for disability income. (Tr. 274, 276).

Plaintiff reported to Unison again in December 2007 explaining her prior failure to comply with treatment was due to her father's illness and subsequent death. (Tr. 263, 268). She reported numerous psychological stressors in the preceding year and requested to be put back on her medications because they had previously helped with her depression. (Tr. 263, 265). Plaintiff again confirmed she tolerated Effexor well, with no side effects. (Tr. 263). In a conversation with her psychiatrist Dr. Shetty, Plaintiff admitted using crack cocaine daily in the past and more recent daily use of marijuana. (Tr. 264; *see also* 272). Due to financial problems, the frequency of her marijuana use decreased and she became dependent on friends sharing the drug with her. (Tr. 264). She admitted having used marijuana the day prior to her visit. (Tr. 264). Plaintiff additionally admitted smoking four to five cigarettes daily and drinking alcohol occasionally.

5

(Tr. 264). Dr. Shetty restarted Plaintiff on Effexor and Trazodone, and strongly recommended abstaining from marijuana. (Tr. 265-66).

In February 2008, Plaintiff reported to Dr. Shetty for a medication follow-up. (Tr. 254). She complained of sleeplessness and increased depression due to the loss of a friend. (Tr. 254). Plaintiff denied any drug or alcohol problems. (Tr. 254). In March 2008, Plaintiff reported she had reduced her Effexor dosage on her own because the prescribed dosage made her drowsy, but said the decreased dosage was still helping her mood. (Tr. 312). She was sleeping well at night with Trazodone and was able to read books again due to an increase in concentration. (Tr. 312). Plaintiff's mood was better and her affect was brighter. (Tr. 312). In December 2008, Plaintiff continued treating her depression with Effexor and began taking Klonopin instead of Trazodone. (480-81). She reported she was trying to abstain from marijuana. (Tr. 480).

In March 2009, Plaintiff reported to Unison and complained her depression had worsened after she received a foreclosure notice. (Tr. 476). She was having suicidal thoughts, but stated she would "never do this". (Tr. 476). She was seen by Dr. Vonderembse, who emphasized Plaintiff was making progress, noting she was working toward overcoming her fear of getting on the bus. (Tr. 476-77). Plaintiff failed to appear for next scheduled appointments in March and April 2009. (Tr. 474-75).

In July 2009, Plaintiff complained of anxiety, panic attacks, fear of leaving home, and chest pain. (Tr. 472). She felt shame and guilt over losing her house to foreclosure. (Tr. 465). She reported a lack of energy and motivation, increased sleep, and increased tiredness, but denied suicidal thoughts. (Tr. 472). On July 9, 2009, psychiatrist Dr. Indurti determined Plaintiff had average intelligence, adequate attention, concentration, insight and judgment, and was oriented to time, place and person. (Tr. 472). Plaintiff failed to follow up in August 2009. (464).

6

Plaintiff saw Dr. Indurti again in September 2009 when she reported to Unison after witnessing her nephew and stepson trying to shoot each other. (Tr. 462). Both men got arrested and she was having anxiety and panic attacks following the event. (Tr. 462). Dr. Indurti again noted Plaintiff was of average intelligence, oriented to time, place and person, had normal memory, and had adequate attention, concentration, insight, and judgment. (Tr. 462).

Opinion evidence

*Treating Psychiatrist – Dr. Shetty*

Dr. Shetty, a psychiatrist who treated Plaintiff at Unison in 2007 and 2008, filled out forms for the Lucas County Department of Job and Family Services in December 2007 stating Plaintiff suffered from depressive disorder, dysthymic disorder, and cannabis dependence, all of which would last for about six to nine months. (Tr. 493-95). She further opined Plaintiff's mental functional capacity was moderately limited in the following aspects:

- the ability to remember locations and work place procedures;
- the ability to understand and remember detailed instructions;
- the ability to carry out detailed instructions;
- the ability to maintain attention and concentration for extended periods;
- the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances;
- the ability to sustain an ordinary routine without special supervision;
- the ability to work in coordination with or proximity to others without being distracted by them;
- the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;
- the ability to accept instructions and respond appropriately to criticism from supervisors;
- the ability to respond appropriately to changes in the work setting.

(Tr. 496). Dr. Shetty determined the above limitations would last between 30 days and nine months. (Tr. 496). She did not prepare a similar form for the Social Security Administration.

7

*Treating Psychiatrist – Dr. Indurti*

On November 5, 2009, Dr. Indurti filled out a Medical Source Statement evaluating Plaintiff's limitations. Dr. Indurti opined Plaintiff was moderately limited in the following abilities: remembering, understanding, and following simple directions; maintaining attention and concentration for two-hour periods of time; performing work activities at a reasonable pace; keeping a regular work schedule and maintaining punctual attendance; interacting appropriately with others; withstanding the stresses and pressures of routine simple unskilled work; and making judgments commensurate with the functions of unskilled work. (Tr. 484-85). He also indicated the limitations noted above had lasted or were expected to last at least twelve months. (Tr. 485).

*Treating Physician – Dr. Zambrano*

Dr. Zambrano was Plaintiff's primary care physician between 2005 and 2007, and in that time he treated her for a number of conditions including depression and symptoms from carpal tunnel syndrome. (*See* Tr. 237-53). In July 2006, Dr. Zambrano filled out a form on Plaintiff's behalf for the Department of Job and Family Services.[3] (Tr. 491-92). There, he opined Plaintiff's ability to sit, stand, and walk were affected and she could only lift or carry up to five pounds. (Tr. 492). He also indicated she was markedly limited in pushing and pulling, bending, reaching, and handling. (Tr. 492) Dr. Zambrano further opined Plaintiff's repetitive foot movements were moderately limited. (Tr. 492). Based on this assessment, Dr. Zambrano stated Plaintiff would be unemployable for at least twelve months. (Tr. 492).

Dr. Zambrano filled out a similar form in December 2007, noting Plaintiff had carpal tunnel syndrome in her right wrist, depression, and anxiety. (Tr. 486). He noted Plaintiff had

---

3. Dr. Zambrano did not prepare an opinion for the purpose of Social Security benefits determination.

experienced these issues for more than three years and was in poor but stable condition. (Tr. 487). Dr. Zambrano further noted Plaintiff was not limited in standing, sitting, or walking and she could lift or carry up to five pounds. (Tr. 488). He suggested she was markedly limited in pushing and pulling, and moderately limited in bending, reaching, and handling.  (Tr. 488). Dr. Zambrano stated Plaintiff was not significantly limited in repetitive foot movements and had no limitations in seeing, hearing, or speaking. (Tr. 488). Based on this assessment, Dr. Zambrano determined Plaintiff was permanently unemployable. (Tr. 488).

Dr. Zambrano also assessed Plaintiff's mental functions, noting moderate limitations in her ability to understand and remember detailed instructions, carry out detailed instructions, maintain attention and concentration for extended periods, work in coordination with others without being distracted by them, complete a normal workday and workweek without interruptions from psychologically-based symptoms, and perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 489). He further opined Plaintiff was moderately limited in her ability to accept instructions and respond appropriately to criticism, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and set realistic goals or make plans independently of others. (Tr. 489). Dr. Zambrano did not give an opinion as to how long Plaintiff's mental limitations would last. (Tr. 489).

*Dr. Avery – Consulting Psychological Examiner*

On April 16, 2008, Dr. Avery evaluated Plaintiff to prepare a disability assessment report and tested Plaintiff's sensorium and cognitive functioning. (Tr. 287-91). He noticed Plaintiff focused primarily on her problems with "crying spells and being around people." (Tr. 289). He concluded Plaintiff was functioning in the bottom end of the low-average range for intellectual functioning. (Tr. 290). Dr. Avery's diagnoses included recurrent moderate major depressive

disorder, chronic pain disorder associated with both psychological factors and a general medical condition, generalized anxiety disorder, relational problems, and posttraumatic stress disorder. (Tr. 290). He further noted Plaintiff had problems with bilateral carpal tunnel, personality disorder, and occupational and economic problems. (Tr. 290). He assessed an overall GAF of 53. (Tr. 290).

Dr. Avery concluded Plaintiff's ability to relate to others was moderately impaired, but she "would be able to relate sufficiently to coworkers and supervisors for simple, repetitive tasks." (Tr. 290). He stated her ability to understand, remember, and follow instructions was moderately impaired, but she was "capable of comprehending and completing simple, routine ADL tasks." (Tr. 291). Dr. Avery believed Plaintiff's ability to maintain attention, concentration, persistence and pace to perform routine tasks was also moderately impaired. (Tr. 291). Additionally, he stated her ability to withstand the stress and pressures associated with day-to-day work activities was moderately impaired, but she had the mental stress tolerance to perform at least simple, repetitive work tasks. (Tr. 291).

Karen Steiger, Ph.D., reviewed Dr. Avery's opinion on October 25, 2008 and determined it was consistent with other medical evidence of record. (Tr. 376). She assigned Dr. Avery's opinion great weight. (Tr. 376).

*Dr. Biscardi – Mental RFC Assessment*

Dr. Biscardi assessed Plaintiff's mental RFC on May 29, 2008. (Tr. 293-300). He found mild restriction of activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (Tr. 298). There were no episodes of decompensation of extended duration. (Tr. 298). Dr. Biscardi noted the following moderate limitations:

- the ability to carry out detailed instructions;
- the ability to maintain attention and concentration for extended periods;
- the ability to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods;
- the ability to interact appropriately with the general public;
- the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes;
- the ability to respond appropriately to changes in the work setting.

(Tr. 301-02).

Dr. Biscardi found Plaintiff's understanding and memory were not significantly limited. (Tr. 301). Likewise, she had no significant limitations in the following abilities: carrying out very short and simple instructions; performing activities within a schedule, maintaining regular attendance, and being punctual within customary tolerances; sustaining an ordinary routine without special supervision; working in coordination with or proximity to others without being distracted by them; making simple work-related decisions; asking simple questions or requesting assistance; accepting instructions and responding appropriately to criticism from supervisors; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; being aware of normal hazards and taking appropriate precautions; traveling in unfamiliar places or using public transportation; and setting realistic goals or making plans independently of others. (Tr. 301-02).

Dr. Biscardi concluded Plaintiff had severe mental impairments that did not meet or medically equal a mental listing and stated she retained sufficient mental capacity to concentrate, understand and remember simple, routine, repetitive instructions. (Tr. 303).

*Dr. Bolz – Physical RFC Assessment*

On June 6, 2008, Dr. Bolz assessed Plaintiff's physical RFC as related to her carpal tunnel syndrome. (Tr. 304-11). He noted Plaintiff could lift twenty pounds occasionally and ten

pounds frequently; could stand, walk, or sit for about six hours in an eight-hour workday; did not have any limitations on pushing and pulling; and could occasionally climb, balance, stoop, kneel, crouch, and crawl. (Tr. 305-06). Dr. Bolz did not note any limitations on reaching, handling, fingering, feeling, or any visual limitations, communicative limitations, or environmental limitations. (Tr. 307-09). He determined these findings were not significantly different from Plaintiff's treating physician's conclusions. (Tr. 310). He also noted Plaintiff was only partially credible because objective medical evidence did not support the severity of her symptoms. (Tr. 311). Dr. W. Jerry McCloud confirmed Dr. Bolz's opinion on November 13, 2008. (Tr. 377).

Plaintiff's Reports of Symptoms

Because the ALJ raised Plaintiff's credibility as an issue, certain statements Plaintiff made throughout the record are worth noting because their inconsistencies provide evidence ultimately supporting the ALJ's RFC conclusions. For example, in an interview with Dr. Avery on April 15, 2008, Plaintiff claimed she stopped working due to her surgery in 2006 (Tr. 288), but another record contradicted that statement (see Tr. 368) (where Plaintiff reported she had "become unable to work due to her depressive symptoms including crying spells and no motivation"). Plaintiff also told Dr. Avery it was her first application for disability (Tr. 287), but "[t]he record show[ed] [she] ha[d] previously filed for disability benefits on several occasions. These applications were medically denied, most recently in June 2007." (Tr. 299).

On April 16, 2008, Plaintiff filled out a Function Report and stated she prepared meals once a day, but she did not cook full course meals every day. (Tr. 186). She said she could do dusting by herself and laundry with some help, and also said she did the dishes. (Tr. 187). She reported she did not go out other than going to her appointments because she did not feel safe and did not drive because traffic made her nervous. (Tr. 187). Plaintiff reported she shopped for

groceries about once a month or her daughter shopped for her. (Tr. 187). She admitted not being able to save money and being late on paying bills and also claimed she tended to forget where she put her money. (Tr. 188). Her reported hobbies included jigsaw puzzles: She stated she had once been able to put a 1000 piece puzzle together in three days, but after her disability onset date it took two or three weeks. (Tr. 187). Plaintiff stated she lost interest in watching TV or doing puzzles after fifteen or twenty minutes. (Tr. 187). She said she needed to be reminded to go places, did not like to interact with people, did not like noise, and just wanted to be alone. (Tr. 187). She claimed her conditions affected lifting, seeing, walking, understanding, memory, completing tasks, and concentration, but said they did not affect using her hands, standing, sitting, reaching, following instructions, or getting along with others. (Tr. 189). On another report, Plaintiff stated the medications for depression and sleeplessness helped her. (Tr. 194).

Notably, Plaintiff's complaints in these reports related to her mental condition; there were no complaints of carpal tunnel syndrome or neck pains. (*See* Tr. 184-95). In July 2008, Plaintiff filled out another questionnaire in which she complained about mental impairments but not physical impairments.[4] (Tr. 216-17).

Administrative Hearing and Decision

The ALJ hearing took place on November 19, 2009. (Tr. 25). Plaintiff testified she stopped working in February 2006 due to carpal tunnel syndrome and depression. (Tr. 31). She said surgeries performed in February and May 2006 alleviated her symptoms for a couple years, but then she started having problems again. (Tr. 31-32). She reported being right-handed and said her right hand felt better than her left hand. (Tr. 32). Plaintiff also complained about muscle spasms and testified medical testing revealed pinched nerves in her neck. (Tr. 32-33).

---

4. For another report where Plaintiff's complaints are limited to her mental conditions, *see* Tr. 199-205.

Plaintiff testified she spent most of the day sleeping, cleaning, and washing walls, but she also stated she did not get out of bed some days. (Tr. 33, 38-39). She talked about her hobbies, which included crocheting and putting together jigsaw puzzles. (Tr. 39-40). At one point she testified she had stopped crocheting a year prior to the hearing because she could not concentrate. (Tr. 39). A few questions later, she complained about her fingers getting numb while crocheting for ten minutes and estimated she was still able to make a baby blanket in about two months. (Tr. 45-48). Similarly, after claiming she had stopped doing jigsaw puzzles, she talked about working on them. (Tr. 40, 48). Plaintiff complained she was not able to cook and could only make a sandwich or prepare peanut butter crackers. (Tr. 34). Nevertheless, she attested to making cakes and using skillets, pots, and pans. (Tr. 44).

Despite her earlier report that she could watch TV and read, Plaintiff testified she could not concentrate on watching movies or doing puzzles, but was able to read. (Tr. 39-40, 290). She said her concentration problems affected her ability to sit for extended periods. (Tr. 42). She further testified her anxiety limited her social life because she could not drive, go shopping, go to church, leave home alone, or attend family dinners. (Tr. 34-35, 39-40, 45-47).

Plaintiff said her physical limitations affected her ability to walk, causing her to fall. (Tr. 42). She complained about shooting pains in her arms, back, and leg, which she said affected her ability to stand for extended time. (Tr. 42-44). She explained she was in pain when carrying a half gallon of milk and also complained that her medications caused lack of appetite, causing her to lose twelve pounds. (Tr. 36-37, 43).

*Vocational Expert Testimony*

The ALJ asked the VE to consider a hypothetical person of Plaintiff's age, education, and work experience, who could perform light level lifting with only occasional overhead reaching,

14

pushing and pulling, and who would be limited to following uncomplicated instructions and having no more than brief and superficial contact with the general public. (Tr. 52). The VE identified three jobs existing in significant numbers in the national economy that such a person could perform: inspector hand packager; folder of laundry products; and a production assembler. (Tr. 53).

After Plaintiff's attorney added an additional limitation on handling and a limit of lifting objects weighing only five pounds or less, the VE testified the above jobs would no longer be available. (Tr. 53-54). Plaintiff's attorney further described a hypothetical person unable to manipulate, hold, or reach for objects weighing more than five pounds and the VE again stated such an individual could not perform the above jobs. (Tr. 54). Finally, Plaintiff's attorney asked the VE to assume the person had a combination of impairments such that she would be *precluded* from following: simple directions, maintaining attention and concentration, performing work at a reasonable pace, interacting with other people, and withstanding the stresses and pressures of routine, simple, unskilled work. (Tr. 54). The VE responded that a person with that combination of impairments would not be able to be competitively employed. (Tr. 54-55).

*The ALJ Decision*

The ALJ determined Plaintiff's date last insured was December 31, 2008 and found she had not engaged in substantial gainful activity since February 21, 2006, the alleged onset date. (Tr. 12). The ALJ further determined Plaintiff had four severe impairments: (1) carpal tunnel syndrome; (2) radiculopathy of the cervical spine; (3) major depression; and (4) anxiety disorder. (Tr. 12). These impairments did not, however, meet or medically equal a listing. (Tr. 13). Accordingly, the ALJ found Plaintiff had the RFC to perform light work, subject to a number of physical and mental limitations, as follows:

> [Plaintiff] can lift and/or carry 20 lbs. occasionally and 10 lbs. frequently and, in a normal 8-hour workday, sit for at least 6 hours, and stand and/or walk for about 6 hours, push and/or pull without additional restrictions, and do no more than occasional reaching overhead, climbing, balancing, kneeling, crouching, or crawling. Mentally, the claimant can understand, remember, and carry out detailed but uncomplicated instructions, and can have a brief and superficial contact with the general public.

(Tr. 15). In reaching this RFC determination, the ALJ found Plaintiff's allegations of complete disability were inconsistent with other statements she had made in the record and therefore, he did not afford them full credibility. (Tr. 16). Further, the ALJ found her statements inconsistent with medical evidence from Plaintiff's treating physicians and psychiatrists. (Tr. 16-17).

The ALJ considered the opinion of Plaintiff's treating psychiatrist, Dr. Indurti, and gave it great but not controlling weight because it was "not wholly consistent with the other substantial evidence in the case record". (Tr. 17-18). Likewise, the ALJ gave great weight to the opinion of independent psychological consultant Dr. Avery, whose findings were "well-supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent . . . with the record as a whole." (Tr. 18).

The ALJ found Plaintiff could not perform her past relevant work, but, based on VE testimony, she could perform jobs existing in significant numbers in the national economy. (Tr. 18-19). Therefore, the ALJ found her not disabled. (Tr. 19-20).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than preponderance and is such relevant

evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

### STANDARD FOR DISABILITY

Eligibility for DIB and SSI is predicated on the existence of a disability. 42 U.S.C. §§ 423(a)(1)(E), 1382(a)(1). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 416.905(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process – found at 20 C.F.R. §§ 404.1520 and 416.920 – to determine if a claimant is disabled:

(1) Was claimant engaged in a substantial gainful activity?

(2) Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe", which is defined as one which substantially limits an individual's ability to perform basic work activities?

(3) Does the severe impairment meet one of the listed impairments?

(4) What is claimant's residual functional capacity and can claimant perform past relevant work?

(5) Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps

One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The court considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)–(f) & 416.920(b)–(f); *see also Walters*, 127 F.3d at 529.

DISCUSSION

Plaintiff challenges step five of the sequential analysis, arguing the ALJ erred in two ways:

1.  The ALJ's assessment of Plaintiff's RFC is not supported by substantial evidence.

2.  The ALJ failed to provide any reason, let alone good reason, for rejecting the opinion of treating physician Dr. Zambrano because the ALJ simply never mentioned Dr. Zambrano's reports.

(Doc. 16, at 12, 16).

Plaintiff specifically argues the ALJ improperly evaluated treating psychiatrist Dr. Indurti's opinion and other source opinions, which she alleges resulted in an RFC assessment inconsistent with substantial evidence. She contends Dr. Indurti's opinion should have been given controlling weight. (Doc. 16, at 13-14). Plaintiff further asserts the ALJ erred by failing to discuss primary care physician Dr. Zambrano's 2007 opinion regarding Plaintiff's limitations.

<u>Treating Physician Rule</u>

An ALJ must weigh medical opinions in the record based on certain factors. 20 C.F.R. § 404.1527(c); 416 C.F.R. 927(c). In determining how much weight to afford a particular opinion, an ALJ must consider: (1) examining relationship; (2) treatment relationship—length, frequency,

18

nature and extent; (3) supportability; (4) consistency; (5) specialization; and (6) other factors that support or contradict the opinion. *Id.*; *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010).

Generally, the medical opinions of treating physicians are accorded greater deference than non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a claimant's] medical impairments and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). A treating physician's opinion is given "controlling weight" if supported by "medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in the case record." *Id.* (citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Even if the treating physician's opinion is not entitled to "controlling weight," there is nevertheless a rebuttable presumption that it deserves "great deference" from the ALJ. *Id.*

Importantly, the ALJ must give "good reasons" for the weight given a treating physician's opinion. *Id.* Failure to do so requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409–10 (6th Cir. 2009). An ALJ's reasoning may be brief, *Allen v. Comm'r of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009), but failure to provide any reasoning requires remand. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 409–10 (6th Cir. 2009). Good reasons are required even when the ALJ's conclusion may be justified based on the record as a whole. The reason-giving requirement exists, in part, to let claimants understand the disposition of their cases,

19

particularly in cases where a claimant knows his physician has deemed him disabled and might be bewildered when told by an ALJ he is not, unless some reason for the agency's decision is supplied. *Wilson*, 378 F.3d at 544 (quotations omitted). "The requirement also ensures the ALJ applied the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Id*.

### Dr. Indurti – Treating Psychiatrist

Plaintiff contends the ALJ did not give Dr. Indurti's opinion appropriate weight because she failed to adopt Dr. Indurti's findings as controlling. The ALJ found Dr. Indurti's opinion "not wholly consistent with the other substantial evidence in the case record", affording it great weight and adopting an RFC she described as "not inconsistent" with Dr. Indurti's assessment. (Tr. 17-18). Plaintiff asserts the record supported Dr. Indurti's opinion and the ALJ's RFC determination was erroneous because it contradicted Dr. Indurti's opinion. (Doc. 16, at 13-16).

### Dr. Indurti's Assessment is Not Wholly Consistent with Other Substantial Evidence

The record revealed that prior to providing his opinion on November 5, 2009, Dr. Indurti saw Plaintiff only twice, on July 9 and September 10, 2009. Each time, Dr. Indurti's notes indicated Plaintiff had average intelligence, adequate attention, concentration, insight, and judgment, and was oriented to time, place and person. (Tr. 462, 472). Yet in his assessments, Dr. Indurti opined Plaintiff had moderate impairments on her ability to "maintain attention and concentration for two-hour periods of time". (Tr. 485) This statement is inconsistent with the doctor's observations two months earlier.

The remaining limitations noted by Dr. Indurti are not directly supported by the record of Plaintiff's treatment at Unison. The records from Plaintiff's treatment between 2006 and 2009 focused on her depression and crying spells and revealed she had no difficulties with learning or any special communication needs. (*See* Tr. 254-86, 458-79). She did not raise concerns about

20

concentration with her psychiatrists. (Tr. 268-69). Other medical sources noted Plaintiff's primary mental complaints were depression, crying spells, and difficulty being around people. (*See* Tr. 289, 291, 303). Accordingly, the seven restrictions noted by Dr. Indurti were not wholly supported by the medical records and not fully consistent with other sources' opinions.

Nevertheless, the ALJ acknowledged moderate limitations in Plaintiff's mental functioning – rising to the level of severe impairments that did not preclude her from uncomplicated instructions with brief and superficial contact with the general public – and she gave great weight to Dr. Indurti's and Dr. Avery's opinions. (Tr. 13, 15, 18). This RFC is consistent with objective evidence of Plaintiff's mental health history and does not contradict Dr. Indurti's assessment of moderate limitations, which suggested Plaintiff's limitations do not necessarily preclude an ability to function in the designated area "on a regular and sustained basis." (*See* Tr. 484).

### Substantial Evidence Supports the ALJ's Mental RFC Findings

Plaintiff's remaining challenges to the ALJ's decision with respect to Dr. Indurti's assessment focus on the terminology used for the limitations placed on her ability to understand, remember, and carry out instructions, and on the lack of express limitations on the ability to handle the stress and pressure of routine, simple, unskilled work. (Doc. 16, at 15-16). The Court finds substantial evidence in the record supports the ALJ's findings.

The ALJ afforded great weight to both Dr. Indurti's and Dr. Avery's findings of moderate impairments in the areas of understanding, remembering, and following instructions. (*See* Tr. 17-18). The ALJ also considered evidence supplied by state agency psychological consultants and Plaintiff's testimony. (Tr. 15-18). Dr. Indurti found moderate limitations in the ability to remember, understand, and follow simple directions, and a "moderate limitation" was defined to

mean it *could* preclude her from functioning in this area on a regular and sustained basis. (Tr. 484-85). Dr. Avery similarly found moderate impairment in Plaintiff's ability to understand, remember, and follow instructions, noting she could still comprehend and complete simple and routine daily tasks. (Tr. 291). Specifically, Dr. Avery found Plaintiff was "mentally capable to understand, remember and follow instructions." (Tr. 291). Dr. Biscardi established moderate limitations on Plaintiff's ability to carry out detailed instructions that did not preclude understanding and remembering simple, routine, repetitive instructions. (Tr. 303). None of the doctors advocated what Plaintiff would like this Court to hold – that she was precluded from understanding, remembering, and carrying out detailed but uncomplicated instructions. Rather, she was *moderately limited* in following instructions. Further, the documents prepared by Plaintiff and her testimony at the hearing do not suggest complete preclusion of understanding, remembering, and following instructions.

In light of Dr. Indurti's opinion that Plaintiff was moderately impaired in remembering, understanding, and following simple instructions – meaning her impairments may, but would not necessarily, preclude her from performing the activity on a regular and sustained basis – and examining consultant Dr. Avery's opinion that Plaintiff was "mentally capable to understand, remember and follow instructions", and considering the remaining record evidence, the ALJ's finding that Plaintiff can "understand, remember, and carry out detailed but uncomplicated instructions" was not in error.

Similar analysis applies to Plaintiff's ability to handle stresses and pressures of routine simple unskilled work. Although Dr. Indurti and Dr. Avery noted moderate limitations in this area, they did not opine Plaintiff would be entirely unable to handle such stresses and pressures. (*See* Tr. 291, 484). Furthermore, the medical records and Plaintiff's testimony show her

22

noncompliance with treatment was a significant factor in her conditions and that with consistent treatment, she was able to overcome some social difficulties such as her fear of getting on the bus. (Tr. 259-62, 263, 265, 268, 476-77). Plaintiff also stated her mental conditions did not affect her ability to get along with others. (Tr. 189). The ALJ did not include an express limitation on the ability to handle stresses and pressures in the RFC, but restricted Plaintiff to brief and superficial contact with the general public. These findings were not in error and satisfactorily account for Plaintiff's mental limitations. Thus, the ALJ did not err in evaluating Dr. Indurti's assessment of Plaintiff's mental limitations.

<u>The ALJ's Failure to Discuss Plaintiff's Treating Physician Dr. Zambrano's Opinion</u>

Plaintiff points to the ALJ's failure to discuss opinions Dr. Zambrano prepared in July 2006 and December 2007 for the Department of Job and Family Services. (Doc. 16, at 16-17). She asserts the treating physician rule required the ALJ to either give Dr. Zambrano's opinion controlling weight or "provide 'good reasons' for discounting" it. (Doc. 16, at 17) (citing *Rogers*, 486 F.3d at 242). Defendant responds that the ALJ was not required to discuss every piece of evidence and that Dr. Zambrano's opinion deserved little weight because it was a check-the-box form, was prepared by a family physician rather than a specialist, and "was not prepared for purposes of determining disability under the Act." (Doc. 17, at 18-20).

Dr. Zambrano assessed Plaintiff's functional limitations twice. (Tr. 488-92). In his first assessment, Dr. Zambrano noted Plaintiff had limitations on sitting, standing, walking, and lifting, could not lift or carry more than five pounds, had marked limitations in pushing, pulling, bending, reaching, and handling, and moderate limitations in repetitive foot movements. (Tr. 491-92). He expected these limitations to last twelve months or more, rendering Plaintiff unemployable. In the 2007 assessment, Dr. Zambrano imposed marked limitations on pushing

23

and pulling and moderate limitations on bending, reaching, and handling. (Tr. 488). He also opined Plaintiff was permanently unemployable. (Tr. 488). In the same assessment, Dr. Zambrano noted moderate limitations in the following areas: understanding, remembering, and carrying out detailed instructions; maintaining attention and concentration; working in coordination with others; completing a normal workday and workweek without interruptions; performing at a consistent pace; accepting instructions and responding appropriately to criticism; getting along with coworkers or peers; and setting realistic goals or making plans independently of others. (Tr. 489).

Defendant does not challenge Dr. Zambrano's status as a treating physician. Under the regulations, a "treating source" includes physicians, psychologists, or "other acceptable medical source[s]" who provide, or have provided, medical treatment or evaluation and who have, or have had, an ongoing treatment relationship with the claimant. 20 C.F.R. § 404.1502.

Although the ALJ was not obligated to "discuss every piece of medical opinion evidence," the assessments made by a treating physician must be expressly evaluated to satisfy procedural requirements associated with the treating physician rule. *Karger v. Comm'r of Soc. Sec.*, 414 F. App'x 739, 753-55 (6th Cir. 2011). The procedural requirement of explaining reasons for the weight given to the treating physician opinion "is intended to protect the interests of a party before the agency" and courts do not excuse its violation on the basis that sufficient evidence in the record would support discounting the doctor's opinion. *Wilson*, 378 F.3d at 544-46; *see also Karger*, 414 F. App'x at 752-54 (reversing the Commissioner's decision where the ALJ failed to expressly mention or provide reasons for ignoring opinions of two treating physicians). *Cf. Jones v. Comm'r of Soc. Sec.*, 2012 WL 727737, *16-17 (N.D. Ohio 2012) (affirming an ALJ's decision that failed to discuss *consulting* physician RFC assessments but

was supported by sufficient substantial evidence). Therefore, even if an ALJ's decision was otherwise supported by substantial evidence, an ALJ's failure to discuss a treating physician's opinion may constitute grounds for reversal. *See Karger*, 414 F. App'x at 754 ("The harmless-error doctrine cannot be stretched far enough to excuse the ALJ's failure to meaningfully indicate, even indirectly, how much weight he accorded the two treating sources . . . and *why*. It is not . . . the district court's role, to scour the record for evidence and expert reasoning which the ALJ *might* have relied on and which *could* support a finding of no-disability *if* the ALJ actually considered it.").

Nevertheless, reversal is not automatic. "For instance, if a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it, a failure to observe § 1527(d)(2) may not warrant reversal." *Wilson*, 378 F.3d at 547 (citing *NLRB v. Wyman–Gordon*, 394 U.S. 759, 766 n.6 (1969) (plurality opinion) (where "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game")). The Sixth Circuit has found an ALJ's failure to discuss a report by the claimant's treating physician was not reversible where the report constituted weak evidence and was nevertheless incorporated in the ALJ's sequential analysis. *Heston v. Commissioner of Social Security*, 245 F.3d 528, 536 (6th Cir. 2001).

This Court recently affirmed an ALJ's decision despite the ALJ's failure to discuss a treating physician's determination that the claimant was unemployable, in *Marvin v. Comm'r of Soc. Sec.*, 2012 WL 7110364 (N.D. Ohio 2012), *adopted by* 2013 WL 518721 (N.D. Ohio 2013). In *Marvin*, however, the treating physician's assessment consisted of a single note authored by the doctor on a prescription pad, unsupported by objective medical findings or

reports. *Id.* Thus, the treating physician's "opinion" was patently deficient and did not warrant the ALJ crediting it.

Plaintiff's case is unlike *Heston* and *Marvin*. Here, the ALJ's opinion completely failed to cite Dr. Zambrano's assessments prepared for the Department of Job and Family Services. There are no allegations that Dr. Zambrano's opinions were deficient in any way. Although Defendant asserts they deserved a lesser weight, they were not so patently contrary to legal standards of treating source evidence that they should have been disregarded in their entirety. Because the ALJ did not even mention Dr. Zambrano, it is impossible for the Court to say whether she considered Dr. Zambrano's assessments in any way. It is entirely unclear whether the ALJ gave any credence to all Dr. Zambrano's statements, and she certainly gave no reasons, let alone good reasons, as to why they were not directly adopted.

When an ALJ discounts treating physician opinions, she must provide "sufficiently specific" reasons for doing so "to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting SSR 96–2p). The Court is unable to determine what weight the ALJ afforded to Dr. Zambrano's opinions, if any, and under what justifications. Thus, the ALJ erred in failing to address Dr. Zambrano's opinion regarding Plaintiff's functional limitations.

The Court further notes that although Plaintiff does not allege the ALJ erred by failing to address opinions given by Plaintiff's other treating psychiatrist, Dr. Shetty, this doctor's assessment noted moderate limitations in certain aspects of Plaintiff's mental functioning. (Tr. 496). In this appeal, Plaintiff relies on Dr. Shetty's assessment only to the extent it is consistent with limitations imposed by Dr. Indurti. Even if Dr. Shetty's opinions are ultimately inconsequential to the RFC finding, because remand is already appropriate, "it would impose no

additional burden on the ALJ to expressly address" the weight she assigned to this treating physician on remand. *See Gerhart v. Comm'r of Soc. Sec.*, 2012 WL 1068986, *8 (N.D. Ohio 2012).

<u>Substantial Evidence Supports the ALJ's Physical RFC Determination</u>

In her Brief on the Merits, Plaintiff focuses on challenging the RFC assessment as it relates to the mental impairments. Plaintiff does not contest, and the undersigned has not found any error in, in the ALJ's analysis of her physical impairments. Therefore, the Court finds the physical RFC assessment supported by substantial evidence.

## CONCLUSION

Following review of the arguments presented, the record, and applicable law, the Court finds substantial evidence does not support the Commissioner's decision denying SSI and DIB benefits to the extent the ALJ failed to explain what weight, if any, she gave to treating physician Dr. Zambrano's opinion. Therefore, the Court reverses and remands the Commissioner's decision pursuant to sentence four of 42 U.S.C. § 405(g), for further proceedings consistent with this opinion.

IT IS SO ORDERED.

                                            s/James R. Knepp, II
                                      United States Magistrate Judge